UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

TRANS-PRO LOGISTIC INC.,

                                  Plaintiff,                    MEMORANDUM
                                                               AND ORDER

        - against -
                                                               05 CV 1759 (CLP)

COBY ELECTRONICS CORPORATION,

                                  Defendant.

---------------------------------------------------------------X

        On April 12, 2005, plaintiff Trans-Pro Logistic, Inc. ("Trans-Pro") commenced this

action against defendant Coby Electronics Corporation ("Coby"), seeking payment for an alleged

breach of contract and account stated. Trans-Pro contends that Coby owes payment for shipping

services allegedly rendered by Trans-Pro. On December 2, 2005, defendant Coby filed a

counterclaim against Trans-Pro, seeking compensation for certain goods allegedly lost from two

shipments in September and November 2004.[1]  On May 27, 2009, the parties consented to a

bench trial before the undersigned, which was bifurcated between evidence pertaining to the

original claims set forth in Trans-Pro's Amended Complaint and evidence relating to Coby's

counterclaims. Following the conclusion of the evidence, the parties submitted post-trial briefs

summarizing their arguments.

        For the reasons set forth below, the Court finds in favor of plaintiff Trans-Pro on its

_____

        [1]On December 2, 2005, Coby also commenced a Third-Party action against CSX
Intermodal, Inc. ("CSX") and Yellowstone Freight, Inc. ("Yellowstone"), the actual transporters
of the two shipments in question. On December 20, 2010, Coby and Third-Party Defendant CSX
entered into a Joint Stipulation of Dismissal With Prejudice, dismissing all claims against CSX
and agreeing that each party would bear its own costs and fees. Yellowstone never filed an
Answer or responded to the Third-Party Complaint and is reportedly out of business.

claims and awards judgment in the amount of $228,913.00, plus $297,463.53 in interest to the date of judgment, as well as attorneys' fees to be determined.

On Coby's claims for damages resulting from the loss of goods in the September and November 2004 shipments, the Court finds that Coby has failed to demonstrate the elements necessary to establish that Trans-Pro was responsible for its alleged losses, and awards judgment in favor of Trans-Pro, dismissing Coby's counterclaims in their entirety.

## I. TRANS-PRO'S CLAIMS

### A. Trial Testimony and Evidence

In its Complaint, Trans-Pro alleges that during the period from September 2, 2004 through November 19, 2004, Trans-Pro entered into agreements with Coby whereby Trans-Pro arranged for sixty-five (65) separate shipments of electronic goods sold by Coby to various consignees. (Compl.[2] ¶¶ 8, 14). Trans-Pro alleges that although it fulfilled its obligations under the contracts, Coby has refused to pay for the transportation, freight and service charges incurred, which total $228,913.00, and is therefore liable for breach of contract. (Id. ¶¶ 9-12, 14-20). Trans-Pro also brings a claim for an account stated based on the charges due and owed by Coby in the amount of $228,913.00.

During the course of the first phase of the trial, Jason Leithead, a sales representative with Trans-Pro since 2003, testified that Trans-Pro is a licensed transport broker that hires contract carriers and arranges for the transportation of commercial goods on behalf of shippers in the

---

[2]Citations to "Compl." refer to the Amended Complaint filed by Trans-Pro on April 12, 2005.

United States and Canada. (Tr.[3] at 8; Compl. ¶ 4). See also Trans-Pro Logistics, Inc. v. Coby Electronics, No. 05 CV 1759, 2009 WL 36824, at *1 (E.D.N.Y. Jan. 6, 2009). According to Leithead, Trans-Pro holds a motor carrier broker's license, which provides the authority under which Trans-Pro operates. (Tr. at 12; Pl.'s Ex.[4] 1). Leithead testified that Trans-Pro hires contract carriers to handle the physical shipments; it does not employ its own trucks in transporting goods.[5] (Tr. at 9).

Leithead testified that among his job responsibilities, which included servicing customers, opening accounts, and handling shipments, he would call prospective customers and offer Trans-Pro's transportation services to help with shipments. (Id. at 8-9). According to Leithead, whenever he opened a new account, he would send the clients an introduction letter, Credit Opening Form ("COF"), a copy of Trans-Pro's broker's authority, and client references. (Id. at 11-12). Between April and June 2004, Leithead contacted Coby in an effort to secure Coby as a client. (Id. at 13). Prior to Leithead's contact in 2004, Coby's business had been solicited by Anthony D'Alesio, a former Trans-Pro sales representative. (Id. at 26-27). Kevin Gu, who was Coby's warehouse manager in Maspeth, New York at the time, confirmed that he was first

---

[3]Citations to "Tr. at" refer to the transcript of the trial proceedings held before this Court beginning on October 18, 2010.

[4]Citations to "Pl.'s Ex." refer to exhibits offered into evidence by plaintiff Trans-Pro during the course of the trial.

[5]The parties presented conflicting testimony as to whether Trans-Pro represented itself to be a carrier instead of a broker or conveyed that impression to Coby. (See discussion *infra* at 19-25).

3

contacted by D'Alesio in April 2003.[6] (Id. at 114). According to Gu, he first learned of Trans-Pro when his California assistant warehouse manager,[7] Tom Toan, informed Gu that D'Alesio had contacted Toan and provided him with certain documentation from Trans-Pro. (Id. at 114). However, it is undisputed that Coby waited almost a year after D'Alesio's initial contact before actually using Trans-Pro's services, with the first shipment occurring on June 29, 2004. (Id. at 13).

According to Leithead, Coby executed a COF, which allowed Trans-Pro to investigate Coby's credit worthiness so that Trans-Pro could decide whether to bill Coby on an open account basis. (Id. at 14-15; Pl.'s Ex. 2). The COF "form[ed] the basis of the business relationship between Trans-Pro and Coby." (Pl.'s CIC Mem.[8] at 3). Peter Boyko, President and part-owner of Trans-Pro, testified that he personally checked Coby's credit application when it came in, including checking the fax number to be certain that the COF came from Coby. (Id. at 65). Boyko explained that he routinely checked the Dunn and Bradstreet ("D&B") history for all companies seeking to do business with Trans-Pro, and if he determined that the client was a

---

[6]Mr. Gu was employed by Coby from October 20, 1992 through July 31, 2010, until Coby moved to Savannah, Georgia. (Id. at 104-05). Although originally hired as a warehouse manager in New York, when he voluntarily resigned from Coby he was serving in the position of National Distribution Manager, with an office in Savannah. (Id. at 106).

[7]Mr. Gu testified that Coby, a manufacturer of consumer electronics, had two warehouses during the 2003-2004 period: one located in Maspeth, New York and the other in Rancho Dominguez, California. (Tr. at 106). As warehouse manager, Gu would contact the carriers, perform inventory management, negotiate carrier rates, and select the carriers. (Id. at 107). He also supervised the Assistant Warehouse Managers and Data Processors at each location. (Id. at 108). Tiffany Lin held the Data Processor position for the California warehouse. (Id.)

[8]Citations to "Pl.'s CIC Mem." refer to the Plaintiff's Post Trial Submissions in Support of its Case in Chief for Recovery of Monetary Damages as a Consequence of Breach of Contract and Account Stated, filed on January 31, 2011.

4

small company with no history, Trans-Pro would do only a few loads on credit. (Id. at 67). For those small companies, Boyko explained that Trans-Pro would give them $5,000 or less of credit, and he "won't particularly look at" the credit application. (Id. at 67, 69). However, when Trans-Pro starts doing business of $15,000 or more, he personally reviews the credit application. (Id. at 70). When Boyko checked Coby's D&B history, he saw the company's financial statement and determined that there was "good equity in the company." (Id. at 67). Accordingly, he decided that he could give them "at least fifty thousand of credit." (Id.)

The COF also contained the terms of payment between Coby and Trans-Pro, and Gu acknowledged he had signed the COF on behalf of Coby as "Manager." (Id. at 15-16, 119-20; Pl.'s Ex. 2). On the first page of the COF, there is a provision entitled "CREDIT CONDITIONS" that sets forth the payment conditions and the penalties to be charged if payment is not timely made. (See Pl.'s Ex. 2). Specifically, the COF provides:

> Every account opened at Trans-Pro Logistic has to be paid
> within 30 days term, starting at the invoice date, unless
> otherwise specified in the contract. Accounts not paid in
> this time frame will be charged 1.5% interest rate per
> month and future orders will be on a C.O.D. basis until the
> account is current.

(Pl.'s Ex. 2).

According to Gu, he understood that the COF authorized Coby to remit payment for services rendered by Trans-Pro on an open account basis. (Tr. at 119-20). However, he testified that in a telephone conversation with D'Alesio, he indicated that Coby did not agree to the terms as stated. (Id. at 120). Gu claimed that he informed D'Alesio that Coby did not agree to pay the interest rate for late payments as indicated in the COF. (Id.) In addition, instead of the 30 day

5

payment term contained in the COF, Gu allegedly told D'Alesio that Coby agreed to make payment within 45-50 days, assuming that the cargo was delivered without issue. (Id.) Specifically, Gu, who claimed to remember his exact words from six years before, testified that he told D'Alesio: "Due to the conditions, we are only paying within 45 to 50-plus days accounts shippers [sic]. Is that okay with your companies? [sic]." (Id, at 143). According to Gu, D'Alesio responded, "As long as you pay consistent[ly] it won't be a problem." (Id.) Gu claims that he replied to D'Alesio's concern by asserting Coby's right to withhold payment if there were problems with the services provided, such as lost or damaged goods, stating: "We will pay if you provide a service with no issues." (Id.) Gu testified that he and D'Alessio were "both clear" on these terms and that D'Alessio accepted them on behalf of Trans-Pro. (Id. at 120-21).

However, on cross-examination, Gu conceded that although he claims to have expressed these reservations about the terms of the credit agreement before he signed the COF, he never received any written acknowledgment from D'Alesio or anyone else at Trans-Pro agreeing with those exceptions. (Id, at 136). He also conceded that he made no notations or corrections on the COF to reflect his position. (Id. at 137). He did not send any e-mails or letters to D'Alesio confirming his understanding, and he received nothing from D'Alesio to verify any agreement other than what is reflected in the COF. (Id. at 137-38).

Moreover, even when Leithead took over for D'Alesio and contacted Gu in 2004, Gu never raised with Leithead the alleged modifications to the terms that he claims were discussed with D'Alesio, including Coby's claimed right to withhold payment for service problems. (Id, at 138-39). According to Leithead, he and Gu discussed the fact that Trans-Pro was a broker, but they never discussed payment terms, claims procedures, or whether Coby could withhold

6

payment if there was a dispute. (Id. at 19). Gu also conceded that he never discussed these

allegedly agreed-upon modifications with Boyko, despite their multiple personal meetings and

telephone conversations about the business relationship. (Id. at 138-39).

According to Boyko, there is nothing in the credit application that allows Coby to

withhold payment in the event of a dispute over the amount of the bill or an outstanding claim for

loss or damage to goods. (Id. at 65-66). Indeed, directly above the signature line of the COF,

which was endorsed by Gu, there is a "Declaration," which reads as follows:

> I hereby represent that I am authorized to submit the application
> on behalf of the commerce named above, and that the information
> provided for the purpose of obtaining credit and is warranted to be
> true. I/we hereby authorize TRANS-PRO LOGISTICS to investigate
> the references listed pertaining to my/our credit and financial
> responsibility. It is agreed and understood that all necessary
> collection and legal fees and monthly interest of 1.5 (at 18% per
> annum maximum) may be charged to my company in the event of
> default or failure to pay for the services or goods received. I/we
> further represent that the client applying for the credit has the
> financial ability and willingness to pay for all invoices within established
> terms.
>
> I, the undersigned (A) certify all the information above to be true and
> complete, (B) authorize and consent to the receipt and provision of
> account and credit information from and to Credit Grantors, Credit
> Bureaus, and Suppliers of goods and Services.

(Pl.'s Ex. 2).

There is no dispute that over a full year passed between Gu's execution of the COF on

April 3, 2003 and the first shipment on or about June 29, 2004. (Id. at 13, 118-119). According

to Leithead, once Trans-Pro began doing business with Coby in June 2004, he dealt primarily

with Tiffany Lin, Coby's Data Processor and Traffic Manager for its California warehouse. Lin

was responsible for notifying Trans-Pro that a shipment was ready for delivery to a particular

7

customer; Leithead would then secure a truck for pick-up and notify Lin as to the name of the carrier and the cost. (Id. at 13-14).

Boyko testified that a few months after Trans-Pro began providing services to Coby in June 2004, he met with Gu in New York and then also flew to California to see him. (Id. at 42). Boyko explained that because the volume of Coby's business was increasing, he wanted to establish a relationship with Gu and get a better idea of Coby's future transportation needs. (Id.) During the meetings, they discussed Coby's service demand and whether there was a way to lock in rates. (Id.) Boyko did not recall discussing credit terms with Gu at that time because it was the beginning of their relationship, and Coby was paying its bills in a timely fashion. (Id. at 42-43).

Gu confirmed that he spoke to Boyko sometime in August 2004, when Boyko came to Gu's office in Maspeth, New York. (Id. at 125). Gu also confirmed that they did not discuss the services Trans-Pro would be offering during that conversation; Boyko had come merely to "appreciate Coby's business." (Id.) Gu stated that Boyko also visited the California location in September 2004, but again there was no discussion at that time of the services to be provided by Trans-Pro. (Id. at 126).

Coby did business with Trans-Pro from May 2004 until November 2004. (Id. at 128). According to Boyko, problems started in September 2004. Specifically, Boyko testified that Trans-Pro maintains an accounts receivable department that notifies him if an account is past due by 30-35 days. (Id. at 44). In the month of September 2004, when the volume of shipments for Coby had started to pick up, he received a notice that Coby's account was past due. (Id. at 45). He told the accounts receivable department to contact Coby to collect the money, and Trans-Pro

8

was then paid. (Id.) Payments started to slow down again in October, when Coby filed a claim for shipment losses allegedly incurred in September. (Id.) Subsequently, according to Boyko, payments became "tougher to get." (Id.) After Coby made a second claim for losses in November 2004, Boyko became involved and dealt with Gu personally, telling him that Coby was past due 40 to 50 thousand dollars and the accounts were 40 to 45 days late. (Id. at 46). Gu said he would call Boyko back, but when another four days had gone by without word, Boyko called Gu again. (Id.) This time, Boyko explicitly told Gu that Coby owed $60,000 and that Trans-Pro needed a payment. (Id. at 47). Gu said he would check. (Id.) Gu never gave a reason for the non-payment; he never indicated that Coby had not received the bills or that it was retaining the payments against the two claims. (Id.)

Several days after the second phone call, Gu told Boyko that because Coby had the two pending claims for losses, it was not going to pay. (Id.) He said that the amount of the claims was about $200,000, and since the amount owed to Trans-Pro was about $220,000, Coby was withholding the money. (Id. at 48). He did not dispute the amount of the bills. (Id.) According to Boyko, the amount owed to Trans-Pro was $228,913. (Id. at 49; Pl.'s Ex. 67). Gu confirmed the substance of this conversation. (Id. at 133-34).

Trans-Pro claims that during the period from September 2, 2004 through November 19, 2004, the parties entered into 65 contracts of carriage, each memorialized by a separate invoice. (See Tr. at 4, 52-53, 118; Pl.'s Exs. 3-66). Until this point, Coby had been consistently paying Trans-Pro for shipments since the two companies began doing business; however, none of these 65 invoices have been paid. (Tr. at 49-52). Boyko identified Plaintiff's Exhibits 3 through 66 as the Coby invoices created by Trans-Pro representing the open accounts. Id. The invoices were

9

all subject to the terms of the COF. Each invoice reflects a separate shipment of Coby products from a point of origin to a destination using a licensed interstate motor or rail carrier secured by Trans-Pro. (Tr. at 13-14; Pl.'s Exs. 3-66). The invoices indicate that payment for transportation freight charges was due from Coby within 30 days of the issuance of the invoice. (Pl.'s Exs. 3-66; Pl.'s CIC Mem., Ex. C).

The parties dispute whether these 65 invoices represented 65 contracts. Trans-Pro argues that each invoice memorialized a separate oral agreement between Trans-Pro and Coby in which Trans-Pro acted as a broker to arrange for a carrier to transport Coby's goods. (Pl.'s CIC Mem. at 11; Tr. 13-15). However, Coby contends that it was under the impression that Trans-Pro was offering carrier services – transporting the goods in its own trucks – not broker services; therefore, Coby argues that because there was a fundamental misunderstanding as to Trans-Pro's role, there was never a meeting of the minds as to the terms of the 65 invoices. (Def.'s Opp.[9] at 7).[10] Nevertheless, although the parties dispute whether contracts were formed and whether Trans-Pro breached the parties' agreement by acting as a broker, it is undisputed that Coby accepted the benefit of Trans-Pro's services for each of the 65 invoiced shipments and that none of these invoices has been paid. (Tr. 49-50, 140-41; Def.'s Opp. at 4).

Boyko testified that there is a set time limit within which payment of an invoice must be made regardless of the amount of credit extended to a customer. (Id. at 73). That period of thirty days is not only indicated on the COF but it is also noted on the individual invoices, and the

---

[9]Citations to "Def.'s Opp." refer to Defendant's Post-Trial Brief in Opposition to Plaintiff's Submissions in Support of its Case in Chief, filed by Coby on March 14, 2011.

[10]See discussion *infra* at 19-25.

10

accounts receivable department orally informs customers of this payment term. (Id., Pl.'s Ex. 2).
Boyko referred to a notation on one of the invoices, bearing number LD62190, where it states
"N-30;" he explained this meant net thirty days. (Id. at 74, Pl.'s Ex. 2).

As the COF details in the "CREDIT CONDITIONS" section and Boyko reiterated in his
testimony, Trans-Pro's recourse in the event that payment is not received within thirty days is to
charge 1.5% per month in interest, plus attorney's fees. (Id. at 75; Pl.'s Ex. 2). When asked if
someone is charged the interest amount when they pay after 45 days, Boyko testified that
normally they would not be charged if they paid after 45 or 50 days, but after 90 days with no
payment, Trans-Pro would close the account. (Id. at 76-77). Boyko testified that although that
policy is not stated anywhere in the document, the customer is orally informed that if payment is
not made within 90 days, the account will be closed and interest will be charged. (Id.) Boyko
testified that after Gu informed him that Cody was withholding payment as an offset against its
claims, Trans-Pro hired an attorney in an effort to collect the amount owed. (Id. at 50; Pl.'s Ex.
67).

Trans-Pro contends that Coby admits it owes payment for the 65 invoices. (Pl.'s CIC
Mem. at 10-11; 2, Pl.'s CIC Reply[11] at 5-6). Plaintiff submitted into evidence a "Reconciliation"
prepared by Coby's accounting department and signed by Gu, which consists of a schedule
charting the invoices rendered by Trans-Pro to Coby documenting the 65 shipments.[12] (Tr. at

---

[11]Citations to "Pl.'s CIC Reply" refer to Plaintiff's Post-Trial Reply Submissions in
Support of its Case in Chief for Recovery of Monetary Damages as a Consequence of Breach of
Contract and Account Stated, filed by Trans-Pro on March 28, 2011.

[12]Gu identified Plaintiff's Exhibit 68 as the account Reconciliation and admitted that he
signed it, although he claimed he did not enter the date next to his signature. (Tr. at 140). He
could not recall whether he signed it in 2004 or 2005. (Id.)

11

129, 139, 140-41, Ex. 68). The total amount owed on the invoices listed in the Reconciliation is $228,403.00. (Id.) Below the line designated as "Total," the Reconciliation states, "Coby agrees to the following Trans-Pro Logistic Invoices listed at a total sum of $228,403.00." (Id.) Gu testified that the Reconciliation was prepared because Coby had outstanding claims against outstanding payments and Coby was withholding payment against the account. (Id. at 141). According to Gu, the numbers on Exhibit 68 were accurate. (Id.)

Trans-Pro presented its own calculation of amounts owed, with a total of $228,913.00 – a difference of $510.00 from the Reconciliation.[13] Although Trans-Pro had offered to waive the difference at the summary judgment stage, given Coby's failure to offer any evidence to explain the discrepancy at trial, Trans-Pro now seeks the entire amount owed: $228,913.00. (Pl.'s CIC Mem. at 9).

## B. Breach of Contract Claim

### 1) The Existence of a Contract

Turning first to plaintiff's breach of contract claim, it is well-established under New York law[14] that a party alleging an action for breach of contract must prove the following: "(1) a

---

[13]The discrepancy is accounted for – but not explained – on the Reconciliation. On three invoices, Coby appears to have unilaterally applied an offset against Trans-Pro's charge. For invoice LD62096, dated 10/1/04, the Reconciliation lists "TransPro's TOTAL" as $3,660 but lists "Coby's TOTAL" as $3,500. In the "Explanation" column, the $160 difference is termed a "Detention Charge." Similarly, the Reconciliation lists a $200 "Storage Charge" on invoice LD63142, dated 10/8/04, and a $150 "Detention Charge" on invoice LD64130, dated 11/10/04. However, the Reconciliation provides no further explanation of the reasons for these three charges, which total $510, and no explanatory testimony was presented at trial.

[14]This Court analyzes the claims under New York law. Both parties' briefs rely on New York law, and no contrary choice of law argument has been raised.

12

contract; (2) performance; (3) breach by the other party; and (4) damages." First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998).

Here, with respect to the first element – the existence of a contract – the Court finds that plaintiff has established that the parties entered into a series of contracts in which it was agreed that Trans-Pro would provide shipping services for the shipment of Coby products from one location to the other. The Credit Opening Form, which was signed by an agent of defendant and does not appear to be in dispute, documents the basic terms of the parties' agreement. (Pl.'s Ex. 2). It is supplemented by the individual invoices for each shipment, which contain the number of items being shipped, the address of the shipper, the address of the consignee to whom the shipment was supposed to be delivered, and the agreed upon cost. (Pl.'s Exs. 3-66). Boyko explained that the term "N-30", as indicated on the invoices, signified "net 30 days for payment." (Tr. at 74).

According to plaintiff's evidence, which was not disputed in this respect, each invoiced shipment constituted a contract by which plaintiff offered to arrange for the shipment of defendant's goods, and defendant orally accepted this offer. (Id. at 13-14). The testimony and documentary evidence presented demonstrates that between September 1, 2004 and November 17, 2004, Trans-Pro agreed to transport 65 separate shipments of goods for Coby, pursuant to 65 separate invoices. Indeed, defendant Coby does not deny that it requested and agreed to use Trans-Pro's services with respect to these 65 shipments. (Ans.[15] ¶ 34).

---

[15]Citations to "Ans." refer to the defendant's Amended Answer to Amended Complaint, filed by Coby on November 23, 2005.

Accordingly, the Court finds that based on the undisputed conduct of the parties,[16] there was a contract between the parties for 65 separate shipments. The Court finds that there was an offer and an acceptance, as well as mutuality of intent and consideration on both sides.

2) Trans-Pro's Performance

Turning to the second and third elements of the breach of contract claim, the Court finds that Trans-Pro performed its obligations under the agreement between the parties in that it arranged for the transportation of Coby's goods in connection with each of the 65 invoices. Although Coby raises arguments that there were disputes as to the terms of the parties' agreements and questions as to whether Trans-Pro represented itself, and was hired as, a carrier or broker (see Def.'s Opp. at 5-7), the evidence demonstrates that Coby requested Trans-Pro's services in delivering each of these 65 shipments, that Trans-Pro made the arrangements for the shipments, that the items were picked up and, with the possible exception of one shipment in September 2004 and another in November 2004, were delivered and accepted. The "Reconciliation" prepared by Coby's accounting department is further evidence that Coby recognized that the shipments had been made and, as Gu testified, the Reconciliation was prepared in part in order to determine "how much [Coby] owe[s] Trans-Pro. . .because we know we have outstanding claims against outstanding payment . . ." (Tr. at 140-41). Moreover, the second page of the Reconciliation states, above Gu's signature, that "Coby agrees to the

_____

[16]As noted *supra* at 10, Coby contends that it contracted with Trans-Pro for carrier, not broker, services and therefore there was no meeting of the minds between the parties. As discussed *infra* at 25, the Court finds no credible evidence to believe that Trans-Pro ever represented that it would be the carrier of these shipments, and indeed, the preponderance of the evidence demonstrates that Coby was well aware that Trans-Pro was arranging for other carriers to pick up the shipments.

14

following TransPro Logistic invoices listed at a total of $228,403." (Pl.'s CIC Reply at 6; Pl.'s Ex. 68).

### 3) Coby's Breach and Defenses

#### a) Modifications to the Parties' Agreement

There is no dispute that Coby failed to pay the shipping costs for the 65 shipments that occurred between September 1, 2004 and November 19, 2004. However, Coby argues that it did not breach its agreement with Trans-Pro because it had the right to withhold payment based on the claimed loss of goods in transit. (Def.'s Opp. at 7-8). In support of this argument, Coby relies on Gu's testimony that he informed D'Alesio that Coby insisted upon the right to withhold payment in the event of service issues, and that D'Alesio accepted this modification. (Id. at 7; Tr. at 136-38, 142-144). However, as Gu acknowledged, he never memorialized this alleged agreement in writing (Tr. at 137), and he never confirmed his understanding of this agreement with either Leithead or Boyko. (Id. at 144). These witnesses confirmed that they never heard of such a modification to the terms of the agreement, and that they never discussed this issue with Gu. (Id. at 19-20, 43, 65-66). Neither the COF nor the invoices contain such a term, and it is undisputed that Gu signed the COF in its current, unaltered state after his claimed conversation with D'Alesio.

Gu further testified that in addition to this change in the standard terms, he also negotiated with D'Alesio to alter the 30 day payment term, which nevertheless appears in the COF and all the invoices, and to eliminate the 1.5% monthly interest charged for late payments.

15

(Id. at 120-21). Again, these alleged changes to the clear terms set forth in the COF[17] are not reflected in writing anywhere and were not discussed with Boyko or Leithead at any time. (Id. at 19, 66, 142-145). Other than Gu's self-serving uncorroborated testimony, no evidence was presented to substantiate Coby's claim that Trans-Pro ever agreed to modify its standard provisions.

Generally, when parties have reduced their agreement to writing, "the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations or agreements offered to contradict or modify the terms of their writing." Adler & Shaykin v. Wachner, 721 F. Supp. 472, 476 (S.D.N.Y. 1988) (citing Meinrath v. Singer, 482 F. Supp. 457, 460 (S.D.N.Y. 1979) (stating that "[o]ne of the oldest and most settled principles of New York law is that a party may not offer proof of prior oral statements to alter or refute the clear meaning of unambiguous terms of written, integrated contracts to which assent has voluntarily been given"). However, the parol evidence rule is only triggered when the parties' agreement is an integrated one, "which is to say, that the writing completely and accurately embodies all of the mutual rights and obligations of the parties." Id (citing cases).

If a written agreement lacks an express clause deeming it an integrated contract, known as a merger clause, the court must first "determine whether the parties intended their agreement to be an integrated contract by reading the writing in light of the surrounding circumstances." Starter Corp. v. Converse, Inc., 170 F.3d 286, 295 (2d Cir. 1999) (citing Bourne v. Walt Disney

---

[17]The COF states: "Every account opened at Trans-Pro Logistic has to be paid within 30 days term. . .*unless otherwise specified in this contract*." (Pl.'s Ex. 2 (emphasis added)). The COF further states: "*It is agreed and understood* that all necessary collection and legal fees and monthly interest of 1.5 (at 18% per annum maximum) may be charged to my company in the event of a default or failure to pay for the services or goods received." (Id. (emphasis added)).

16

Co., 68 F.3d 621, 627 (2d Cir. 1995)). To make this determination, New York courts evaluate a variety of factors, including whether the document in question refers to an extrinsic oral agreement, whether the parties were represented by counsel when they negotiated the written agreement, whether these negotiations occurred over a lengthy period, whether the condition at issue is fundamental, and whether the agreement contains formal language, similar to a standard merger clause, declaring that the agreement reflects a mutual understanding. Adler & Shaykin v. Wachner, 721 F. Supp. at 476 (citing cases).

If an agreement is deemed unintegrated, extrinsic evidence, such as oral negotiations preceding the signing of the agreement, may be considered "to supply the remaining terms of the parties' overall understanding."[18] Point Developers, Inc. v. FDIC, 921 F. Supp. 1014, 1020

[18]There are two exceptions to the parol evidence rule where extrinsic evidence is admissible even if the written contract in question is an integrated one. The first is that even if a written contract is integrated, parol evidence may be considered to clarify ambiguous or equivocal contract terms, such as when a contract term is susceptible to at least two reasonable meanings. See Adler & Shaykin v. Wachner, 721 F. Supp. at 478 (citing cases); see also Rattigan v. Commodore Int'l Ltd., No. 87 Civ. 2729, 1989 U.S. Dist. LEXIS 14645, at *2, 4 (S.D.N.Y. Dec. 8, 1989). However, the "traditional view is that the search for ambiguity must be conducted within the four corners of the writing." Adler & Shaykin v. Wachner, 721 F. Supp. at 478 (citing W. Union Tel. Co. v. Am. Commc'ns Ass'n, 299 N.Y. 177, 86 N.E.2d 162 (1949)). In addition, even if a written contract is integrated, extrinsic evidence of a contemporaneous or prior oral agreement may be considered if the alleged extrinsic agreement is collateral – that is, "separate, independent and complete. . .although relating to the same object." Adler & Shaykin v. Wachner, 721 F.Supp. at 478 (internal citation omitted). However, before a court may consider evidence of this type, three conditions must be met: (1) the alleged extrinsic agreement must be collateral in form; (2) it must not contradict express or implied provisions of the written contract; and (3) "it must be one that the parties would not ordinarily be expected to embody in the writing. . .[it] must not be so clearly connected with the principal transaction as to be part and parcel of it." Id. (quoting Mitchill v. Lath, 247 N.Y. 377, 160 N.E. 646 (1928). Even if this Court found that the COF was an integrated contract, neither of the exceptions is applicable here. First, there is no ambiguity on the late payment interest term within the four corners of the COF. It plainly states that "monthly interest of 1.5 (at 18% per annum maximum) may be charged. . .in the event of default or failure to pay. . . ." Second, the alleged contemporaneous oral agreement to which Gu testified is not collateral because it fails the second prong: it directly contradicts an

17

(S.D.N.Y. 1996); Saxon Capital Corp. v. Wilvin Assocs., 195 A.D.2d 429, 600 N.Y.S.2d 708, 709 (1st Dep't 1993)). In evaluating the weight to accord extrinsic evidence of alleged prior or contemporaneous oral negotiations, courts evaluate "whether the parties would ordinarily be expected to embody the[ir] agreement in a writing 'based on the type of transaction involved, the scope of the written contract and the content of any other agreements.'" Starter Corp. v. Converse, Inc., 170 F.3d at 295 (2d Cir. 1999) (citing Bourne v. Walt Disney Co., 68 F.3d at 627).

Here, the COF lacks a merger clause. Accordingly, the Court next considers the "surrounding circumstances" to "determine whether the parties intended their agreement to be an integrated contract." Starter Corp. v. Converse, Inc., 170 F.3d at 295. Given that the COF lacks such essential terms as the goods to be transported, the dates of pickup and delivery, the fees to be charged, and the amount of credit extended, the COF cannot stand alone as a writing that "completely and accurately embodies all of the mutual rights and obligations of the parties." Adler & Shaykin v. Wachner, 721 F. Supp. at 476. In addition, the COF lacks the indicia of an integrated agreement; it was negotiated informally, quickly, and without counsel. Consequently, the Court finds that the COF is not an integrated written contract.[19]

In considering Gu's testimony concerning the alleged oral modifications agreed to by D'Alesio, the Court finds that these are the type of contract modifications that the parties would

_____

express provision of the written contract.

[19]Trans-Pro appears to concede this point in its post-trial submissions. It makes no argument that the COF is an integrated contract; instead, it contends that "while the COF may not be an integrated contract, the oral modifications asserted by Gu cannot be read into the agreement. . . ." (Pl.'s CIC Reply at 7).

18

expect to memorialize in writing.[20] See Starter Corp. v. Converse, Inc., 170 F.3d at 295. As plaintiff notes, Gu's alleged oral agreement with D'Alesio would have "dramatically altered the payment terms of an account of hundreds of thousands of dollars." (Pl.'s CIC Mem. at 11). Nevertheless, Coby asks the Court to believe that, after his conversation with D'Alesio, Gu signed the COF without a single noted modification, despite the fact that it contained the 30 day payment period, 1.5% interest for late payments, and no right to withhold payment against claims for shipment problems, all contrary to what Gu claims he negotiated. Coby also asks the Court to believe that Gu, despite having won these valuable concessions, made no notations on the COF to indicate the changed payment terms, never asked for nor received written or oral confirmation of the change in terms, and never discussed the changes a year later with either Leithead or Boyko, after D'Alesio had left Trans-Pro.[21]

Given the economic stakes and the alleged direct contradiction of the detailed payment language of the COF, the Court finds that these are the types of changes the parties would be

---

[20]Citing Section 5-701 of the N.Y. Gen. Oblig. Law, Trans-Pro argues that any oral agreement would have had to have been performed within one year to be valid. (Pl.'s CIC Reply at 11-12). Given that defendant admits that over a year elapsed between the execution of the COF and Trans-Pro's first shipment for Coby, plaintiff contends that any oral modification agreement made between Gu and D'Alesio prior to the signing of the COF is void. Plaintiff misstates the Statute of Frauds, which requires that any agreement must be in writing that, by its terms, will not or cannot be performed within one year. See N.Y. Gen. Oblig. Law § 5-701(a)(1). Here, the terms of the alleged oral modification did not specify that the first shipment would happen more than a year later, and at the time the COF was executed, it was possible that the contract could be performed within a year. The oral modifications alleged would not have needed to be in writing to be enforceable.

[21]Defendant asserts that it is commonplace in the industry for shippers "to withhold freight charges against claimed lost or damaged goods" and common for Coby to negotiate oral modifications to carriers' payment terms without reducing the changes to writing. (Id.) However, Coby provides no other authority for its depiction of the industry or support for its own allegedly common practice.

19

expected to memorialize in writing. See Starter Corp. v. Converse, Inc., 170 F.3d at 295.
Accordingly, the Court declines to credit Gu's uncorroborated testimony that Trans-Pro agreed to change the payment terms or agreed to allow Coby the right to withhold payment in the event of service issues was agreed to by Trans-Pro. Consequently, the Court finds that the COF was not modified.

### b) Trans-Pro's Role as Broker or Carrier

Coby argues that because Trans-Pro misrepresented itself to be a carrier and Coby contracted for carrier, not broker, services, Trans-Pro failed to carry out its contractual obligations and therefore Coby is excused from having to pay.

"[F]ailure to tender payment is generally deemed a material breach of a contract." ARP Films, Inc. v. Marvel Entertainment Group, Inc., 952 F.2d 643, 649 (2d Cir. 1991). "Non-payment is a material breach of a contract unless the withholding party has a valid excuse." REI Transport, Inc. v. C.H. Robinson Worldwide, Inc., 519 F.3d 693, 698 (7th Cir. 2008). Here, Coby contends that it should be excused from paying because Trans-Pro "failed to perform its contractual obligations." (Ans. ¶¶ 14, 26). Specifically, defendant argues that Trans-Pro contracted to provide Coby with carrier services but instead only provided broker services. (See Def.'s Opp. at 7).

In support of this argument, Coby presented Gu's testimony that when he first learned of Trans-Pro in April 2003, his California manager Tom Toan informed him that a "carrier" had contacted him. (Tr. at 113). Gu testified that near the end of March 2003, Anthony D'Alesio from Trans-Pro contacted Gu directly by phone. (Id. at 116). According to Gu, D'Alesio told him that Trans-Pro could provide "carrier service to haul our cargos out of California. . .and they

20

can give us competitive rates." (Id. at 117).

Gu testified that when he initially spoke to D'Alesio, Gu indicated that he was requesting a transportation carrier. (Id. at 118). According to Gu, during this period from 2003-2004, Coby had its own trucks at its warehouse in Maspeth, New York but no transportation for California. (Id.) In transporting goods, Coby would use common carriers, such as parcel carriers, or less than truckload ("LTL") carriers to carry the cargo directly to the customer or to the distribution centers. (Id. at 110). He testified that Coby had used C.H. Robinson as its broker beginning in 2000 (id. at 112), and that Coby would use Yellow Freight, ABF, Daylight, and UPS as parcel carriers. (Id. at 111). He then reiterated that he understood Trans-Pro to be acting in the capacity of a carrier, explaining that he had no intention of using Trans-Pro as a broker because Coby already had a broker, and there was no need for a second one. (Id. at 121-22).

According to Gu, D'Alesio sent Toan a packet of promotional materials, which Toan provided to Gu and which Gu identified at trial. (Id. at 114; Def.'s Exs. M, N). Based on his review of the promotional materials, Gu understood that Trans-Pro could provide both carrier and broker services, as well as "additional warehouse logistic duties." (Tr. at 117). Gu specifically cited a reference letter from Sunkist which described Trans-Pro as "a carrier/broker [used by Sunkist] for the past ten years." (Tr. at 117, Def.'s Ex. N). However, Gu conceded that he never contacted anyone at Sunkist regarding Trans-Pro. (Id. at 259). Apart from this reference to "carrier/broker" in the Sunkist letter, there was nothing in the promotional literature that described Trans-Pro as a "carrier," and indeed, Trans-Pro enclosed its Interstate Commerce

21

Ex. N).[22]

Gu conceded that even though Trans-Pro included a broker's license in the promotional package and not a carrier's license, he did not request a copy of Trans-Pro's carrier license. (Id. at 252). He claimed this was because he only requested copies of the license from carriers he did not know. (Id.) However, on cross-examination Gu conceded that he had never met D'Alesio before and never used Trans-Pro, and therefore he did review Trans-Pro's license. (Id. at 253-54). Furthermore, he conceded that Trans-Pro's license plainly states that it is evidence of the applicant's authority to engage in operations as a broker. (Id. at 255). In addition, Gu admitted that he had Trans-Pro broker's license in his possession for a year before he decided to engage in business with them. (Id.) Gu also conceded that although Trans-Pro submitted a copy of its insurance policy, which explicitly states that it covers Trans-Pro's operations as a freight forwarder, he never checked to see if they were covered as a carrier. (Id. at 258). Moreover, Gu admitted that Coby's bill of lading forms require drivers to indicate the carriers for whom they work; one of these bills of lading was completed for every shipment Trans-Pro handled for Coby. (Tr. at 290-91). Nevertheless, throughout the life of Coby's business relationship with Trans-Pro, Gu claimed that he never saw any documentation that indicated that Trans-Pro was not acting as a carrier. (Id. at 132). Lastly, Gu admitted that he did not contact any of Trans-Pro's

_____

[22]Although the March 28, 2003 cover letter from D'Alesio enclosing these items touted Trans-Pro's "large network of trucks," "exclusive fleet," and "strong freight shipping services," stating "[w]e ship full loads and LTL crossborder. . . ." (Def.'s Exs. M, N), there is nothing in the letter that describes Trans-Pro as a carrier and the described services are not inconsistent with Trans-Pro's role as a broker. The Court notes that in the materials supplied to Coby, D'Alesio included Trans-Pro's certificate of insurance, listing it as a "freight forwarder." (Def.'s Ex. N). However, neither party has argued that Trans-Pro was a "freight forwarder" and thus, the Court has not examined Trans-Pro's potential liability as a freight forwarder.

22

references; he simply read the reference letters. (Id. at 259-60).

According to Gu, in his early discussions with Leithead about the possibility of Coby contracting with Trans-Pro for shipment services, Leithead provided Gu with cost numbers that Gu understood as Trans-Pro's rates for carrier – not broker – services.[23] (Id. at 124). Gu testified that nothing said in the subsequent conversations led him to understand that Trans-Pro would not be providing carrier services. (Id.) Gu also testified that during his personal meetings with Boyko, there was never any discussion of the services to be provided by Trans-Pro. (Id. at 125-26).

Gu testified that Tiffany Lin, Coby's Data Processor and Traffic Manager, served as Coby's point person for arranging shipments from California, including those involving Trans-Pro. (Id. at 264). Gu explained that whenever Coby had goods in need of shipment, he would select the carrier to be used and provide Lin with the going market rate that Coby was willing to pay. (Id. at 264-66). While Ms. Lin did not have the negotiating authority to set the initial price, she did have the authority to contact brokers and negotiate a lower price than the one he gave her. (Id. at 267-68). According to Gu, Lin created the bill of lading for each shipment. (Id. at 290). The driver who signs the bill of lading indicates the name of the carrier in the bottom right hand corner. (Id. at 291). Gu conceded that he never looked at the bill of lading for any of the Trans-Pro shipments until the November shipment; however, the California warehouse staff would see the bill of lading when the driver signed for the count. (Id. at 292-93).

Trans-Pro disputes Coby's claim that Trans-Pro held itself out as a carrier and that Trans-

---

[23]This testimony alone is not credible in light of the course of dealings between the parties in which the costs for each shipment were negotiated and different, a practice that Gu himself confirmed. (Tr. at 268).

23

Pro exclusively contracted with Coby to provide carrier services. In addition to its license, which clearly indicates that Trans-Pro is a "broker" (see Ex. N), the testimony of the Trans-Pro witnesses regarding the course of dealing between the parties demonstrates that Trans-Pro was arranging for carriers to pick up and deliver Coby's goods, not providing these services itself. Leithead confirmed that following the execution of the COF on April 3, 2003,[24] and the first shipment on or about June 29, 2004, he dealt mainly with Lin in processing the shipments. (Tr. at 13, 23, 108).

According to Leithead's unimpeached testimony, the booking process made clear that Trans-Pro was acting as a broker, not a carrier. Leithead explained that Lin would contact him by e-mail to notify him when she had a shipment to be transported, and he would help hire carriers to pick up the shipments. (Tr. at 13). The rates were determined on a per shipment basis and "[e]verything was always different." (Id. at 14). Once he secured a truck – or train – for pick-up, he would notify Lin as to the name of the carrier that was coming to pick up the goods and how much it was going to cost. (Id. at 14, 549, 567). She would then indicate whether the price and carrier were acceptable or not. (Id. at 14).[25]

As Leithead explained, his phone calls and e-mails made it clear that it was not a Trans-

_____

[24]There is no dispute that over a full year passed between the time that Gu executed the COF and the date of the first shipment. (Tr. at 118-120).

[25]Occasionally, Lin would express stricter carrier preferences. When Coby needed to ship a load valued at over $100,000, Lin would inform Leithead of the higher value so that he could be sure to select a carrier with adequate insurance or secure supplemental insurance for that shipment. (Id. at 553-54). In addition, for some shipments, including the September shipment in dispute here, Lin specifically requested that Trans-Pro secure a rail carrier. (Id. at 561). According to Leithead, Lin knew in each instance that the carriers were not using Trans-Pro trucks. (Id. at 568).

24

Pro truck that was coming to collect the shipments. (Id. at 568) Indeed, Leithead identified Plaintiff's Exhibits 69 and 72, which were e-mails to Lin informing her of the names of the non-Trans-Pro carriers for specific pickups. (Id. at 569-70; Pl.'s Exs. 69, 72). With respect to the November shipment at issue here, Leithead testified that he specifically told Lin that Yellowstone was being used to transport the shipment. (Id. at 569).

Despite Coby's argument that it contracted with Trans-Pro exclusively for carrier services, there is no documentary evidence to support that claim, and this argument directly contradicts both testimony and documentary evidence in the record, particularly the e-mails between Lin and Leithead. (See Pl.'s Exs. 69, 72). While the COF and invoices do not address what company will physically transport the goods, leaving this an open term, the unimpeached testimony of Jason Leithead reveals that Coby and its employees were fully aware that Trans-Pro was providing broker services – not carrier services – in arranging the transport of the 65 shipments of goods between September and November 2004. Not only had Trans-Pro been shipping goods for Coby for several months prior to September 2004, but Tiffany Lin, Trans-Pro's main shipping contact at Coby, received, reviewed, and approved both the carrier and price of each shipment and drafted the bill of lading for each shipment. Even Gu conceded that the name of the carrier appeared on each bill of lading; however, he never bothered to check them. In addition, the license provided to Gu prior to his agreement to use Trans-Pro's services clearly grants Trans-Pro authority to operate as a broker, not as a carrier. (See Def.'s Ex. N).

Moreover, the Court does not credit Coby's claim that Trans-Pro misled Coby into believing that Trans-Pro was providing carrier services. Although Coby argues that the promotional materials provided by D'Alesio contain some ambiguity as to whether Trans-Pro

25

was operating as a carrier, broker, or freight forwarder (see Def.'s Opp. Ex. N), the operating license is unambiguous. (See Def.'s Ex. N). Again, despite having more than a year to verify Trans-Pro's licensing status, Gu admitted that he took no steps to request the carrier's license or to verify Trans-Pro operating authority, and he never raised the issue with Leithead or Boyko even though his discussions with D'Alesio had occurred a year earlier. (Tr. at 8, 142-145). In addition, even after Coby experienced its first problem with a Trans-Pro shipment in September 2004, Gu took no steps to investigate whether Trans-Pro was providing broker or carrier services, such as by reviewing the bills of lading, until approximately three months later.

Consequently, this Court finds that plaintiff has established by a preponderance of the evidence that for each shipment, there was an offer and acceptance, as well as mutuality of intent and consideration. Given that this Court finds that the 65 invoices, coupled with the COF, represent 65 individual contracts,[26] the Court also finds that Trans-Pro fulfilled its contractual obligations. The Court further finds that defendant's proffered excuse for not tendering payment to plaintiff is invalid. Accordingly, the Court finds that Coby breached its agreement to pay Trans-Pro for the services rendered.

### 4) Plaintiff's Damages

Plaintiff Trans-Pro seeks damages in the amount of $228,913.00, representing the costs of services provided in connection with the 65 Coby shipments. In support of this calculation, Trans-Pro has submitted the 65 invoices at issue, which set forth the amounts owed. There is no dispute that the invoices were received by Coby, and indeed, Gu testified that he had seen and

---

[26]See *supra* at 13-14.

26

reviewed them. (Tr. at 129, 132). Coby's accounting department identified each of the 65 invoices in its Reconciliation, including their dates and amounts, demonstrating Coby's receipt. (Id. at 141, Ex. A at 28). Although Coby ultimately objected to the invoices, this occurred several months[27] after the receipt of the earliest invoice in September 2004.

Having considered the evidence presented at trial, the Court finds that based on Coby's undisputed failure to pay any of the invoices from Trans-Pro, and therefore its breach of its obligations under the agreement between the parties, Trans-Pro has been damaged in the amount of $228,913.00.

### 5) Interest and Legal Fees

Citing the terms of the COF, Trans-Pro further argues that it is entitled to interest calculated at the rate of 1.5% per month, 18% per annum, based on the defendant's failure to pay. The "Credit Conditions" section of the COF provides that accounts that are not timely paid "will be charged 1.5% interest rate per month." (Pl.'s Ex. 2). Similarly, the COF's "Declaration" provision, which appears directly above Gu's signature, explicitly states: "It is agreed and understood that all necessary collection and legal fees and monthly interest of 1.5%. . .may be charged to my company in the event of default or failure to pay for the services or goods

---

[27]The timing of this conversation is unclear from the record. In its brief, Trans-Pro contends that "Coby failed to object to the invoices until February [2005], a period of approximately four months following the receipt of the earliest unpaid invoices." (Pl.'s CIC Mem. at 14). However, Coby correctly notes that Trans-Pro asserts this "without citation to the record." (Def.'s Opp. at 9, n.8). In contrast, Coby argues that "Boyko, plaintiff's President, admitted that Coby disputed the amount allegedly owed at the beginning of December 2004" (id. at 9 (citing Tr. at 46-48)), but the cited pages in the transcript simply refer to Boyko's testimony that Gu admitted to the amount owed to Trans-Pro but declared that he was withholding payment as an offset against Coby's claims.

27

received." (Id.)

Plaintiff relies on Financial One Publishing Co. Ltd. v. Lehman Brothers Special Finance, Inc., No. 00 CV 6739, 2003 WL 21638214, at *1 (S.D.N.Y. July 11, 2003), which held that "[i]t is well-settled under Second Circuit law that the entitlement to and amount of interest in a breach of contract action is governed by the state law under which the contract is interpreted," and that "if the contract provides for a different rate [than the statutory rate], that rate shall control." Id. (citing cases) (internal citations omitted).

As discussed *supra* at 15-19, defendant Coby argues that even though Gu signed the COF directly underneath the paragraph containing the interest term, Coby did not agree to this term. Instead, Coby claims that Gu and D'Alesio, Trans-Pro's representative, agreed to an oral modification of the contract, which eliminated the interest provision. (Tr. at 120-21 (stating "[t]he open term condition is after I review this document I had a conversation with Anthony [D'Alesio] indicated that we are not going to pay the one point five interest rates at the eighteen percent annual maximum rates condition")).

The Court does not credit the self-serving and unsupported testimony of Gu that he and D'Alesio orally agreed to modify the terms of the COF so as to strike the interest provision entirely and absolve Coby of any responsibility in the event of delinquent payments. Accordingly, this Court finds that the parties entered into a binding agreement in which they agreed that in the event of non-payment, Coby would pay interest and attorneys' fees incurred in collection. Accordingly, the Court awards Trans-Pro interest in the amount of $297,463.53,[28]

_____

[28]Per the COF, interest accrued at a rate of 1.5% per month. Dividing the 18% per annum interest by the 365 days in a year yields an interest rate of 0.04932% per day.

28

beginning on the date of October 8, 2004,[29] to and including the date of this Order. The total interest owed is broken down by individual invoices in the chart attached hereto as Appendix A.

The Court also finds that pursuant to the terms of the invoices and COF, plaintiff is entitled to an award of reasonable attorneys' fees and costs incurred in pursuing this claim. To the extent that Trans-Pro seeks attorneys' fees and costs, it is Ordered to submit supporting documentation on or before February 29, 2012, with any response from Coby due March 14, 2012.

C. Account Stated Claim

Trans-Pro also alleges a claim for an account stated. "An account stated occurs when a debtor and a creditor come to a mutual agreement as to how much the debtor owes the creditor," Johnson and Johnson Fin. Corp. v. BSR Realty L.P., No. CV-96-0567, 1996 WL 546284, at *4 (E.D.N.Y. Sept. 19, 1996), and even without a formal contract, this mutual agreement is enforceable. Given defendant Coby's arguments that no agreement existed between the parties because Trans-Pro breached by providing broker services instead of carrier services, plaintiff's account stated claim provides an alternative theory of recovery.

In order to establish an account stated, Trans-Pro must prove that Coby manifested an express or implied "'promise [as] a debtor to pay a stated sum of money which the parties had agreed upon as the amount due.'" David R. Maltz & Co., Inc. v. Wachovia Bank, N.A., 2010

---

[29]Plaintiff's Complaint seeks prejudgment interest calculated from September 2, 2004, to the date of judgment. (See Compl. at 5). In contrast, Plaintiff's Statement of Damages, filed October 14, 2010, states that plaintiff seeks to have prejudgment interest calculated from January 18, 2005 to the day of judgment. See id. at 1. However, the first unpaid invoice, LD62190, came due on October 7, 2004. Therefore, interest on this invoice began accruing on October 8, 2004. Similarly, each of the subsequent invoices began accruing interest the day after the 30 day payment grace period expired.

29

WL 1286308, at *11 (quoting White Diamond Co., Ltd. v. Castco, Inc., 436 F.Supp.2d 615, 623 (S.D.N.Y. 2006)); see also Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff, 638 F. Supp. 714, 719 (S.D.N.Y. 1986). This promise "'must be founded upon previous transactions'" between the parties "'creating the relationship of debtor and creditor.'" David R. Maltz & Co., Inc. v. Wachovia Bank, N.A., 2010 WL 1286308, at *11; see also Nuera Commc'ns., Inc. v. Telron Commc'ns. USA, Inc., No. 00 CV 9167, 2002 WL 31778796, at *3 (S.D.N.Y. Nov.15, 2002). The parties must agree as to the accuracy of the balance due. Harold R. Clune Inc. v. Healthco Medical Supply, 78 A.D.2d 914, 433 N.Y.S.2d 52, 53 (3rd Dep't 1980), and "[t]here can be no account stated where any dispute about the account is shown to have existed." Candelarie v. Scientific Innovations, Inc., No. 08 CV 1714, 2009 WL 2824727, at *4 (E.D.N.Y. Aug. 28, 2009) (internal quotation omitted).

However, "[a]s a general rule, where an account is made up and rendered . . .[and] the party receiving it. . .makes no objection within a reasonable time, his silence will be construed into an acquiescence in its justness, and he will be bound by it as if it were a stated account." MRC Industries, Inc. v. Global Therapy Systems, LLC, No. 06-CV-3633, 2009 WL 2461106, at *2 (E.D.N.Y. Aug. 7, 2009) (citing Tom Rice Buick-Pontiac v. General Motors Corp., 551 F.3d 149, 157 (2d Cir. 2008) (internal citations omitted)). In order to defeat the implication of an account stated, a party who "receiv[es] a statement of account [and] keeps it without objecting to it within a reasonable amount of time" must show "fraud, mistake, or other equitable considerations. . . ." See Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff, 638 F. Supp. at 719. Consequently, a party receiving a statement of amounts owed "is required to examine [the statement] for accuracy" and "if he admits it to be correct" – either expressly or by keeping it

without objecting to it a reasonable time – "it becomes a stated account." Id. The agreed-upon amount "is binding on both parties – the balance being the debt which may be sued for and recovered at law." Id. See also Kaye, Scholer, Fierman, Hays & Handler v. Ameritas Financial Services, No. 93 CV 0222, 1993 WL 258680, at *3 (S.D.N.Y. July 2, 1993).

In this case, although it is undisputed that the invoices were sent to Coby and retained, Coby claims that it objected within a reasonable time to the balance claimed as due. (Def.'s Opp. at 9). Gu testified that Coby registered its objection to the amount owed in the beginning of December 2004, approximately three months after receiving the first invoices from Trans-Pro and one month after the last ones. (Tr. at 138-39; see also id. at 46-48). Since "[e]vidence of an oral objection, even if not documented, is sufficient to rebut an inference of agreement by acquiescence, Nat'l Union Fire Ins. Co. of Penn. v. Cohen, No. 92 CV 9500, 1994 WL 719704 at *12 (S.D.N.Y. Dec. 28, 1994) (citation omitted), Coby argues that based on the timely dispute of the amount owed, plaintiff has failed to prove its claim for account stated.

In response, plaintiff contends that Coby never disputed the amount owed, but rather raised a separate defense to its obligation to pay – namely, its right to offset any amount owed based on the damages suffered in connection with two of the 65 shipments. Indeed, Boyko's testimony, which the Court credits, was that Gu stated that he was not paying the open account because "right now we have for two hundred and something thousand of claims. My payable to Trans-Pro is about 220 and it's about the same amount, so we're not paying you. We're withholding your money." (Tr. at 48).

Although the parties dispute when Gu first indicated to Boyko that Coby would be

31

withholding payment of its bills against its claims,[30] the date of this discussion is irrelevant. Gu's statement that "my payable to Trans-Pro is about 220 and it's about the same amount, so we're not paying you" does not dispute the amount owed; in fact, it is an express agreement to the charges stated. See David R. Maltz & Co., Inc. v. Wachovia Bank, N.A., 2010 WL 1286308, at *12. Further support for the conclusion that Coby concedes the accuracy of the amounts owed is set forth in the Reconciliation, which was prepared by Coby's own accounting department and signed by Gu. The Reconciliation explicitly states, directly above Gu's signature, that "Coby agrees to the following TransPro Logistic [sic] invoices listed at a total of $228,403.00."[31] (Pl.'s CIC Mem., Ex. E at 2).

Instead of objecting to the accuracy of the amounts billed on Trans-Pro's invoices, Gu's statement to Boyko asserts a separate right to withhold payment due to a reason unrelated to the amounts owed. Essentially, as it argues in its counterclaim, discussed *infra* at 34, Coby claims the right to offset the amount of these two claims against the amount it agrees it otherwise owes Trans-Pro. (Def.'s CIC Mem.[32] at 8-9). Coby then claims the right to offset the amount of these two claims against the amount it agrees it otherwise owes Trans-Pro. However, as courts applying New York law have consistently held, "breach of contract is not available to defendant

---

[30]See *supra* note 27.

[31]Although the Reconciliation notes discrepancies totaling $510 between what Trans-Pro has charged and what Coby admits to owing on three of the sixty-five invoices, there is no indication that these discrepancies were communicated to Trans-Pro prior to discovery. Accordingly, the discrepancies noted on the Reconciliation are precluded from being considered timely-raised objections to the amount of the account stated. See *supra* note 13.

[32]Citations to "Def.'s CIC Mem." refer to the Counterclaim and Third-Party Plaintiff's Post-Trial Brief in Support of its Case in Chief, which was filed by Coby on May 17, 2011.

32

as a means to seek adjustment of an account stated." American Home Assurance Co. v. Instituto Nacional de Reaseguros, 1991 WL 4461, at *5 n. 1; see also In re Rockefeller Center Properties, 272 B.R. at 543; Marino v. Watkins, 112 A.D.2d at 512, 490 N.Y.S.2d at 919.  Absent a contractual provision allowing such an offset, Coby had no right to attempt to satisfy its claims for losses by withholding payment on the account stated in the 65 invoices it received, reviewed, and accepted.

Given the testimony presented at trial, the Court finds that plaintiff has established its claim for an account stated by a preponderance of the evidence and is therefore entitled to damages in the amount of $228,913.00, plus interest and fees.  However, an account stated claim "is distinct from one for breach of contract, and cannot be utilized simply as another means to attempt to collect under a disputed contract." David R. Maltz & Co., Inc. v. Wachovia Bank, N.A., No. 07-CV-1049, 2010 WL 1286308, at *11 (E.D.N.Y. March 31, 2010) (internal citations omitted).  In contrast to breach of contract actions, account stated claims are quasi-contractual causes of action based on theories of unjust enrichment.  See generally, Guandong Enterprises (North America) Fur Holdings Ltd. v. Hennessy, No. 01 CV 0620, 2002 WL 1000953, at *17 (S.D.N.Y. May 15, 2002).  These claims properly arise in situations where there is an underlying express agreement between the parties giving rise to liability but no formal contract between them.  Id.  Consequently, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."  Xuchang Rihetai Human Hair Goods Co., Ltd. v. Hanyu Int'l USA Inc., No. 00 CV 5585, 2001 WL 883646, at *5 (S.D.N.Y. Aug. 7, 2001) (citing cases).

33

Here, plaintiff's claims for breach of contract and account stated involve the same subject

matter – the 65 unpaid invoices for shipments of Coby electronics. Furthermore, as discussed

*supra* at 13-14, this Court finds that the parties' mutual agreement to the combined terms of the

Credit Opening Form and the invoices for the individual shipments created 65 valid and

enforceable express contracts. Accordingly, plaintiff is precluded from double recovery under its

account stated claim. Id.

## II. Coby's Counterclaim

In its Answer to the Complaint, Coby included counterclaims seeking damages for the

alleged loss of merchandise that occurred during the course of two shipments in September 2004

and November 2004. Coby contends that Trans-Pro qualifies as a "motor carrier" within the

meaning of the Carmack Amendment, 49 U.S.C. § 14706, and is therefore liable for Coby's loss.

Following the trial, Coby submitted its Post-Trial Brief, withdrawing its claim as to the

September shipment, conceding that the "testimony and evidence admitted at trial is insufficient

to satisfy Coby's burden of proof with respect to the loss incurred in connection with the

September shipment." (Def.'s CIC Mem. at 2, n.1). Coby now appears to be seeking damages

only for the November loss.

### A. Legal Standard – The Carmack Amendment

Interstate cargo claims are governed by the Carmack Amendment ("Carmack") to the

Interstate Commerce Act of 1887 ("IAC"), which imposes strict liability on motor carriers for

loss or damage to goods transported in interstate commerce, but limits damages to the value of

the goods affected.[33] 49 U.S.C. § 14706(a), (d), (f). The IAC defines a "motor carrier" as "a person providing commercial motor vehicle. . .transportation for compensation." 49 U.S.C. § 13102(2).[34]

Brokers, however, are not subject to liability under the Carmack Amendment. See AIOI Ins. Co. v. Timely Integrated, Inc., 08 CV 1479, 2009 WL 2474072, at *2 (S.D.N.Y. Aug. 12, 2009). The IAC defines a "broker" as "a person, other than a motor carrier, . . .that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. 13102(14). In determining whether an entity is a broker or carrier, the caselaw is clear that this determination is made not by reference to the license held or the ownership of the vehicles used to transport the goods; rather, "[t]he Courts look at whether the party holds itself out to the public generally as the actual transporter of goods. . .as well as the services provided under the contract." Delta Research Corp. v. EMS, Inc., 04 CV 60046, 2006 WL 1042048, at *5 (E.D. Mich. April 19, 2006). See also Ensco, Inc. v. Weicker Transfer &

---

[33]The Carmack Amendment preempts common and state law causes of action that would expose carriers to liability beyond the actual value of the goods lost, damaged, or untimely delivered. 49 U.S.C. § 14706.

[34]The IAC also deals with "freight forwarders," which is defined as "a person holding itself out to the general public. . .to provide transportation of property for compensation. . ." while also offering assembly, consolidation, break-bulk, and distribution services, assuming responsibility for the full transportation route from origin to destination, and sub-contracting with a carrier for some portion of the journey. 49 U.S.C. § 13102(8). For purposes of assigning liability for lost or damaged goods, the Carmack Amendment regards a freight forwarder as "both the receiving and delivering carrier." 49 U.S.C. § 14706(a)(2). As noted *supra* note 22, the parties do not contend that Trans-Pro was acting as a freight forwarder in connection with the disputed Coby shipments, despite Trans-Pro's insurance policy's statement that it concerns Trans-Pro's operations as a freight forwarder. (See Def.'s Ex. N).

Storage Co., 689 F.2d 921, 925 (9th Cir. 1982) (holding that "an entity's status is determined. . .by reference to what [the entity] holds itself out to be").

A shipper seeking to recover damages from a carrier under the Carmack Amendment must first establish a prima facie case that the goods were provided in good condition but arrived in a damaged condition, and must demonstrate the amount of damages suffered. See AIOI Ins. Co. v. Timely Integrated, Inc., 2009 WL 2474072, *1 (stating, "in an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows "that the shipment was delivered to the defendant in good condition, that it was damaged when it arrived at its destination, and the amount of damages"); see also Nipponkoa Ins. Co. v. C.H. Robinson Worldwide, Inc., No. 09 CV 2365, 2011 WL 671747, at *13 (S.D.N.Y. Feb. 18, 2011). Once the shipper makes this showing, the carrier "seeking to avoid liability must demonstrate that the damage was caused not by negligence but 'by (a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." Nipponkoa Ins. Co. v. C.H. Robinson Worldwide, Inc., 2011 WL 671747, at *3 (citations omitted).

### 2) Analysis

#### a) Trans-Pro's Status

The parties dispute the application of the Carmack Amendment in this case, with Trans-Pro asserting that it was a broker and not a carrier, which is what Coby alleges.[35] Given (1) that Gu's testimony and the Sunkist reference letter are the only evidence suggesting that Trans-Pro

---

[35]See discussion *supra* at 20-26.

36

may have held itself out as a "carrier" in the alleged discussions with D'Alesio that occurred over a year before the two parties actually engaged in any business transactions; (2) that Trans-Pro's license, which Gu admitted reviewing, grants Trans-Pro broker authority only; and (3) the undisputed fact that Lin approved the independent carriers for each of the 65 shipments Trans-Pro arranged for Coby, the Court finds that the preponderance of the evidence shows that Trans-Pro was not a "carrier" as defined by the Carmack Amendment.

### b) Responsibility for the Lost Goods

Even if the Court had found that Trans-Pro was a "carrier" under the Carmack Amendment, defendant's counterclaim fails because Coby failed to provide sufficient evidence to make out a prima facie case for imposing liability on Trans-Pro for the losses it claims from the November 19, 2004 shipment. In fact, Coby failed to satisfy all three of the prongs necessary for a prima facie case; its evidence failed to demonstrate that the shipment was delivered to Trans-Pro in good condition, that it was damaged when it arrived at BrandsMart, or the amount of damages.

### (i) Condition at the Time of Delivery to Coby

In support of its counterclaim, Coby relies almost exclusively on the testimony of Gu. In his testimony, Gu first described the general procedure followed by Coby in response to a purchase order from a customer. (Tr. at 154-55). The warehouse department is given a sales pick list, which the "order picker," a member of the warehouse staff, uses to select the products ordered and then place them on a pallet. Next, a second person, the "checker," uses the list to validate the selection. (Id. at 155). Order quantities are measured in individual units, but units

37

are stored in sealed cases.[36] (Id.) If an order requires full cases, the order picker simply selects enough cases containing that product to fill the order and places them on pallets; the checker then reviews the order. (Id.) If an order is for less than a case and there are no loose stock items, a case is opened and the correct number is removed to satisfy the customer's order; the checker then reviews the order. (Id.) After the checker verifies the quantity, the individual items that had been removed from sealed cases are collected, put in a new brown box, resealed with Coby's custom security tape, and loaded onto pallets. (Id. at 155-56).

The pallets are then covered with shrink wrap from top to bottom to secure them. (Id. at 157). Ms. Lin then calls for the truck to pick up the pallets.[37] At that point, the shipping documents are prepared and the warehouse people wait for the "pickup numbers," which are the bill of lading numbers. (Id.) The pickup numbers are given to the carriers to identify the correct load, and the driver of the truck is asked to cross count each pallet and make sure that it matches the original shipping documents; the result is called the "shipper load/driver count." (Id. at 158). As a standard procedure, a shipment is not permitted to leave the Coby warehouse unless the driver has performed the count and signed the bill of lading. (Id. at 158-59).

On cross-examination, Gu admitted that the truck driver counts the cartons after they have been shrink wrapped, and only then is the pallet moved onto a truck. (Id. at 273). He conceded that the driver could only count the outside boxes once the pallet is shrink wrapped. (Id. at 274). However, he indicated that the Coby employees would take the wrap off if

---

[36]For example, the DVD players at issue here came in cases of six units each. (See Tr. at 319).

[37]Gu testified that Lin was only a data processor; she had no managerial responsibilities. (Id. at 159-60).

38

necessary for the driver to count the boxes and then re-shrink wrap the pallets. (Id. at 275-280).

After the merchandise is loaded into the truck, a metal seal is placed on the loading doors of the truck. (Id.) Coby has its own custom-made seals featuring the Coby name and a unique number that is then put on the bill of lading. (Id. at 281). The purpose of the seal is to make sure no one goes into the truck before it is ready to be unloaded. (Id.)

In November 2004, Coby was informed that there had been a loss of certain cargo shipments that had been transported by Trans-Pro and intended for delivery to Interbond, d/b/a BrandsMart. (Id. at 160, 162). Specifically, Coby claims that a full load of merchandise left Coby's California warehouse intended for delivery to 3200 Southwest 42nd Street in Hollywood, Florida but did not arrive fully intact. (Id. at 162; Def.'s Ex. D). Gu testified that Coby maintains 24-hour digital radio recorder security cameras at the California warehouse.[38] (Id. at 165). Gu reported that, upon learning of the loss, he reviewed the video tape recording made on November 12, 2004,[39] which he claimed shows the cases of DVD players at issue here arriving at the warehouse from overseas, being off-loaded, and being prepared for shipment to BrandsMart. (Id. at 171, 312-326). Gu identified Exhibit T as the packing list for the shipment of DVD

---

[38]Coby called as a witness David Lee, Assistant Management Information Systems ("MIS") manager for Coby, who has been employed at Coby for eight years. (Id. at 200). As such, he testified that he is familiar with Coby's computer system. (Id. at 201). According to Lee, he searched the security footage for the Los Angeles warehouse for November 12, 2004, and discovered two files for that date. (Id. at 201-02). Both files were created on November 19, 2004. (Id., Def.'s Ex. Y).

[39]During the proceedings on October 19 and October 20, 2010, both plaintiff's and defendant's counsel address this witness as "Mr. Lin." (Tr. at 199, 203, 208). However, this appears to be an error. Prior to calling him to the stand, defense counsel refers to this man as "Mr. Lee" (id. at 199), and at the time he was sworn in, the court reporter recorded his name as David Lee. (Id.)

39

players that went to BrandsMart and testified that the only products at issue in this shipment were DVD players. (Id. at 172, 173, Def.'s Ex. T).

Gu explained that, unlike the procedure described above, the November BrandsMart shipment was a special purchase order; the goods arrived in California in one shipment from overseas, "one solid containers [sic] inbound from ocean is dedicated for one specific customer, which is BrandsMart. So it's a trans-loading process." (Id. at 174). Therefore, there was no need for the normal pick/pack process; the cases in the container were simply put on pallets, the total piece count was verified, and then the shipment was transferred to the outbound loading area to be counted and verified. (Id.) Gu testified that when Coby received the product in its California warehouse, there were six units in a case, each sealed with Coby customer security tape. (Id. at 173). The packing slip was prepared for 1,750 cartons or cases. (Id.)

Gu testified that upon review of the videotape, he observed the loading of the entire inbound overseas shipment onto 28 pallets, stacked in uniform configurations "nine per tier, seven high." (Id. at 321). Each pallet was then individually shrink-wrapped and transferred from the inbound receiving area of the warehouse to the outbound shipping area. (Id. at 322). The pallets remained in that area until the carrier's trucks arrived and the loading process began. (Id. at 324). According to Gu, the same number of cases were loaded onto the trucks as was indicated on the bill of lading. (Id. at 327). Gu testified that during the loading process, he observed "[t]he truck drivers get onto the forklift and counting every single pallets and he has a pen in his hand and writing the numbers down." (Id.) Gu admitted that the shrink wrap was not removed from the pallets for the driver to count the cases, but he asserted that this was not necessary because "these were countable pallets,. . .every single tier and the layer is countable."

40

(Id.) According to Gu, the driver then signed the documents he was given. (Id. at 328-330).

It is unclear from Gu's testimony whether seals were affixed to the truck's loading doors before it drove away. When asked if he observed anything further after the driver signed the documents, Gu stated "Yes. After he signed the documents, hand it over to our people, they have left our loading document and pull away the truck away from the platform. So, my guys are following down to assist, close the door and putting the seals on." (Id. at 330). However, when defendant's counsel followed up by asking, "I want to limit that to what did you observe?" Gu replied only, "I see the trucks pulling away from the loading dock and then our people following down to the forklift to the ramp and then the drivers that our loading dock." (Id.)

### (ii) Condition of the Goods Upon Delivery to BrandsMart

Gu testified that when a claim is made by a customer regarding a shortage of goods, Coby's normal practice is to retrieve the shipping documents from the carrier, confirm the contents of the shipment, and determine the actual loss. (Id. at 210). Among the documents that are reviewed are the claim form, packing list, bill of lading, and delivery receipt. (Id.) These are then forwarded to the Claims Department. (Id. at 210-11). Generally, Coby asks the carrier to provide the claim form; Lin then fills out the form. (Id. at 211).

In this case, Gu testified that after he received a call from BrandsMart regarding the loss, he instructed Ruby Gomez, a Coby staff member located in Miami, to go to the customer's site to observe what the customer claimed to be a shortage. (Id. at 185). Gu asked the customer to send a copy of the bill of lading that it had received with the final count, and told the customer not to break down the pallets until a member of Coby's staff arrived. (Id.)

41

Gu testified that he received a phone call from Gomez when he arrived at the BrandsMart warehouse, and Gu instructed Gomez to check the count verification, clarify the total quantity that the customer was claiming, and take photographs. (Id. at 189-90). Subsequently, Gu received an e-mail with photographs attached. (Id. at 190, Def.'s Ex. B). Gu testified that he reviewed the photographs at the time, along with the customer's copy of the bill of lading. (Id. at 192). He also requested copies from BrandsMart of any security tapes that they may have had. (Id. at 194). Gu forwarded that e-mail to Coby's internal personnel as well as to Jason Leithead at Trans-Pro. (Id. at 186).

Gu identified the claim form that Trans-Pro provided for the BrandsMart loss. (Id. at 213, Def.'s Ex. G). He explained that when a bill of lading is generated for a shipment, there are three copies: the original is kept by the shipper, and parts two and three are given to the carrier. (Id. at 236-37). If it is a truckload carrier, one of the copies will be used as proof of receipt; if the shipment is less than a full truckload, the LTL carrier will have its own documents. (Id. at 237). When the truckload is exclusively for Coby, Coby places a seal on the truck. (Id.) According to Gu, the BrandsMart shipment in November 2004 was a full truckload.

Gu testified that as a matter of course for "every single shipment," Coby demands a "POD" (proof of delivery) from the carrier. (Id. at 239). He identified Defendant's Exhibit H as the carrier's proof of delivery receipt form and not the Coby bill of lading. (Id. at 240). In this case, Exhibit H did not contain the shipper's total case count. (Id. at 241). Gu did, however, testify that BrandsMart has a conveyor belt with an overhead scanner. (Id. at 285). He also testified that BrandsMart requires every vendor, including Coby, to have bar codes – UCC 14 – on all merchandise being delivered to its warehouse. (Id. at 286). He testified at his deposition that the purpose is so that the UCC bar code can be scanned by the overhead scanner as the items

42

come off the truck, onto the conveyor belt, and into the warehouse. (Id. at 287).

Gu also testified that he was in charge of conducting inventory at Coby's warehouse; Coby does a "quarterly wall to wall inventory" and weekly sample counts on high tech items. (Id. at 243). He testified that in conducting inventory during 2004 and 2005, Coby never discovered any missing cartons of the DVD players ordered by BrandsMart in the warehouse. (Id. at 244).

Gu identified Defendant's Exhibit J as a document sent by Trans-Pro declining to pay for the loss of the November shipment. (Id. at 246, Def.'s Ex. J). Gu also testified that he subsequently learned that the truck that delivered the November load was not a Trans-Pro truck, but rather a Yellowstone truck. (Id. at 248).

He conceded that with respect to the November shipment, there was no evidence that a Coby seal had been placed on the truck or that the truck's Coby seal was damaged or broken when the truck arrived for delivery at BrandsMart. (Id. at 382). Once a seal has been removed or damaged, it cannot be reaffixed or replaced without revealing that it had been tampered with or changed. (Id. at 382-83). Although Gu attempted to avoid answering the question as to whether an intact seal meant an intact shipment, at his deposition he conceded that "'[i]n general, in the industry, when a seal is intact that means the contents are intact.'" (Id. at 375). However, he testified on redirect at trial that the receiver of the truck load could not tell the difference between the Coby seal and a different seal. (Id. at 423). He further admitted that he did not know who personally cut the seal on either shipment or whether that person compared the seal to the bill of lading. (Id. at 440). He had no knowledge as to whether a counterfeit seal was placed on either the September or November shipments. (Id. at 441). He admitted that he never asked BrandsMart to conduct an audit of its facility with respect to either the September or November

43

shipments. (Id. at 376).

### (iii) The Amount of Damages

Gu testified that he concluded from his investigation that the November shipment arrived at BrandsMart with a 3,888 piece "concealed shortage." (Id. at 337-38). Gu also testified that the allegedly missing merchandise has not been located and that Coby was not paid by its customer for that merchandise. (Id. at 242-44). However, Coby produced no other evidence as to the extent or the dollar value of this shortage.[40]

### (iv) Discussion

Based on the evidence presented by Coby, the Court finds that Coby has failed to establish by a preponderance of the evidence that the goods were "delivered in good condition" to the carrier. Although Gu testified that he observed the security video of the BrandsMart shipment as it was being off-loaded upon arrival at the Coby warehouse from overseas, and that he observed the Coby employees load the shipment onto the carrier truck, Coby presented no evidence to demonstrate that anyone checked the overseas shipment in the intervening time to determine if all of the items allegedly contained in the cases were actually there. Indeed, in the absence of evidence to demonstrate that the Coby seal had been tampered with or removed prior to the arrival in Florida, Gu's own testimony established that the shipment, as it had been loaded onto the truck at Coby's own warehouse, would have arrived intact, which suggests that the items

---

[40]Although Coby contends in its post-trial submission that the shortage is valued at $134,874.72 (Def.'s CIC Mem. at 5, 9 (citing Tr. at 337-38)), no evidence of this amount was admitted at trial. Defendant's Exhibit G, identified by Gu as the claim form filled out by Lin for the November shipment, was admitted into evidence solely for the design of the form itself; the information entered into the form was excluded as hearsay. (Tr. at 215). Coby offered no other evidence of the amount of its claim.

44

were missing from the boxes prior to being loaded onto the truck. Thus, the Court finds that Coby has failed to establish the first prong of the prima facie case required under Carmack.

Furthermore, the Court finds that Coby has failed to establish by a preponderance of the evidence that the goods were damaged when they arrived at BrandsMart. Indeed, the Court was provided with no evidence as to the nature of the claimed loss; it is unclear if entire pallets were missing, if cases were missing from pallets, if boxes were missing from inside the cases, or if there were DVD players missing from the boxes themselves. In addition, there was no evidence presented as to when the loss was discovered. Was the loss discovered when the truck was first opened or when the individual boxes were opened? Were the cases still shrink wrapped when removed from the truck? More importantly, there was no evidence as to the observations of the BrandsMart employees when the truck arrived in Florida with respect to the Coby seal on the truck or the status of the shipment contained therein. Finally, there is no evidence as to whether BrandsMart did an inventory of its warehouse to determine whether the missing items were there; indeed, Gu testified that he did not ask BrandsMart to conduct such an inventory. Consequently, the Court finds that Coby has failed to establish the second prong of the prima facie case as well.

Lastly, due to the complete lack of evidence as to the amount of the loss claimed by Coby, the Court finds that Coby has failed to satisfy the third prong of the prima facie case required by Carmack.

Accordingly, based on the absence of proof, the Court renders judgment in favor of Trans-Pro on the counterclaim.

## CONCLUSION

For the reasons set forth above, the Court finds in favor of plaintiff Trans-Pro on its claims and awards judgment in the amount of $228,913.00, plus $297,463.53 in interest to the

45

date of judgment, as well as reasonable attorneys' fees to be determined. In addition, for the reasons described above, the Court finds in favor of Trans-Pro on Coby's counterclaim. Plaintiff is hereby ordered to submit a request for a specified amount of attorneys' fees and costs, along with supporting documentation, by February 29, 2012. If defendant wishes to contest plaintiff's requested fees, defendant must do so by March 14, 2012.

The Clerk is directed to send copies of this Order to the parties either electronically through the ECF system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
February 15, 2012

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York

46

## APPENDIX A

| Invoice No. | Invoice Date | Due Date | Amount | Late By | Interest Owed |
|---|---|---|---|---|---|
| LD62190 | 9/7/2004 | 10/7/2004 | $1,850 | 88 months, 7 days | $2,448.39 |
| LD62282 | 9/9/2004 | 10/9/2004 | $3,800 | 88 months, 5 days | $5,025.37 |
| LD62223 | 9/17/2004 | 10/17/2004 | $3,500 | 87 months, 27 days | $4,614.11 |
| LD62459 | 9/24/2004 | 10/24/2004 | $3,800 | 87 months, 20 days | $4,996.48 |
| LD62583 | 9/27/2004 | 10/27/2004 | $3,800 | 87 months, 17 days | $4,990.86 |
| LD62096 | 9/29/2004 | 10/29/2004 | $3,660 | 87 months, 15 days | $4,803.38 |
| LD62799 | 10/1/2004 | 11/1/2004 | $1,250 | 87 months, 13 days | $1,639.26 |
| LD62800 | 10/1/2004 | 11/1/2004 | $1,250 | 87 months, 13 days | $1,639.26 |
| LD62843 | 10/1/2004 | 11/1/2004 | $3,100 | 87 months, 13 days | $4,065.38 |
| LD62920 | 10/1/2004 | 11/1/2004 | $500 | 87 months, 13 days | $655.71 |
| LD62803 | 10/4/2004 | 11/4/2004 | $1,100 | 87 months, 10 days | $1,440.93 |
| LD62807 | 10/5/2004 | 11/5/2004 | $3,800 | 87 months, 9 days | $4,975.87 |
| LD62867 | 10/7/2004 | 11/7/2004 | $2,800 | 87 months, 7 days | $3,663.67 |
| LD62896 | 10/8/2004 | 11/8/2004 | $2,100 | 87 months, 6 days | $2,746.71 |
| LD63011 | 10/11/2004 | 11/11/2004 | $3,900 | 87 months, 3 day | $5,095.27 |
| LD63018 | 10/11/2004 | 11/11/2004 | $3,800 | 87 months, 3 day | $4,964.62 |
| LD63086 | 10/11/2004 | 11/11/2004 | $2,800 | 87 months, 3 day | $3,658.14 |
| LD63051 | 10/12/2004 | 11/12/2004 | $2,100 | 87 months, 2 days | $2,742.57 |
| LD63088 | 10/12/2004 | 11/12/2004 | $3,900 | 87 months, 2 days | $5,093.35 |
| LD63037 | 10/13/2004 | 11/13/2004 | $3,800 | 87 months, 1 day | $4,960.87 |
| LD63112 | 10/13/2004 | 11/13/2004 | $3,800 | 87 months, 1 day | $4,960.87 |
| LD63114 | 10/13/2004 | 11/13/2004 | $3,900 | 87 months, 1 day | $5,091.42 |
| LD63142 | 10/14/2004 | 11/14/2004 | $2,900 | 87 months, 0 days | $3,784.50 |
| LD63167 | 10/14/2004 | 11/14/2004 | $2,475 | 87 months, 0 days | $3,229.88 |
| LD63194 | 10/14/2004 | 11/14/2004 | $650 | 87 months, 0 days | $848.25 |

| Invoice No. | Invoice Date | Due Date | Amount | Late By | Interest Owed |
|---|---|---|---|---|---|
| LD63111 | 10/15/2004 | 11/15/2004 | $3,800 | 86 months, 29 days | $4,956.35 |
| LD63252 | 10/18/2004 | 11/18/2004 | $3,900 | 86 months, 26 days | $5,081.01 |
| LD63254 | 10/19/2004 | 11/19/2004 | $2,900 | 86 months, 25 days | $3,776.76 |
| LD63262 | 10/19/2004 | 11/19/2004 | $3,300 | 86 months, 25 days | $4,297.69 |
| LD63375 | 10/21/2004 | 11/21/2004 | $3,200 | 86 months, 23 days | $4,164.30 |
| LD63406 | 10/21/2004 | 11/21/2004 | $3,300 | 86 months, 23 days | $4,294.43 |
| LD63374 | 10/22/2004 | 11/22/2004 | $3,900 | 86 months, 22 days | $5,073.32 |
| LD63470 | 10/25/2004 | 11/25/2004 | $4,100 | 86 months, 19 days | $5,327.42 |
| LD63381 | 10/26/2004 | 11/26/2004 | $3,900 | 86 months, 18 days | $5,065.62 |
| LD63502 | 10/26/2004 | 11/26/2004 | $4,050 | 86 months, 18 days | $5,260.45 |
| LD63527 | 10/26/2004 | 11/26/2004 | $4,300 | 86 months, 18 days | $5,585.17 |
| LD63530 | 10/26/2004 | 11/26/2004 | $4,000 | 86 months, 18 days | $5,195.51 |
| LD63592 | 10/28/2004 | 11/28/2004 | $4,200 | 86 months, 16 days | $5,451.14 |
| LD63617 | 10/28/2004 | 11/28/2004 | $3,400 | 86 months, 16 days | $4,412.83 |
| LD63526 | 10/29/2004 | 11/29/2004 | $3,900 | 86 months, 15 days | $5,059.85 |
| LD63591 | 10/29/2004 | 11/29/2004 | $4,200 | 86 months, 15 days | $5,449.07 |
| LD63593 | 10/29/2004 | 11/29/2004 | $4,200 | 86 months, 15 days | $5,449.07 |
| LD63602 | 10/29/2004 | 11/29/2004 | $4,200 | 86 months, 15 days | $5,449.07 |
| LD63609 | 10/29/2004 | 11/29/2004 | $4,200 | 86 months, 15 days | $5,449.07 |
| LD63579 | 11/1/2004 | 12/1/2004 | $3,050 | 86 months, 13 days | $3,954.06 |
| LD63739 | 11/1/2004 | 12/1/2004 | $4,200 | 86 months, 13 days | $5,444.93 |
| LD63675 | 11/2/2004 | 12/2/2004 | $4,200 | 86 months, 12 days | $5,442.86 |
| LD63766 | 11/2/2004 | 12/2/2004 | $3,500 | 86 months, 12 days | $4,535.71 |
| LD63749 | 11/3/2004 | 12/3/2004 | $3,600 | 86 months, 11 days | $4,663.53 |
| LD63819 | 11/5/2004 | 12/5/2004 | $3,400 | 86 months, 9 days | $4,401.09 |
| LD63823 | 11/5/2004 | 12/5/2004 | $4,300 | 86 months, 9 days | $5,566.09 |
| LD63821 | 11/8/2004 | 12/8/2004 | $4,300 | 86 months, 5 days | $5,557.60 |

| Invoice No. | Invoice Date | Due Date | Amount | Late By | Interest Owed |
|---|---|---|---|---|---|
| LD63992 | 11/11/2004 | 12/11/2004 | $3,900 | 86 months, 3 days | $5,036.77 |
| LD64076 | 11/11/2004 | 12/11/2004 | $4,500 | 86 months, 3 days | $5,811.66 |
| LD64064 | 11/12/2004 | 12/12/2004 | $2,478 | 86 months, 2 days | $3,199.06 |
| LD64130 | 11/15/2004 | 12/15/2004 | $4,450 | 85 months, 29 days | $5,737.40 |
| LD64193 | 11/15/2004 | 12/15/2004 | $4,700 | 85 months, 29 days | $6,059.72 |
| LD64195 | 11/15/2004 | 12/15/2004 | $4,750 | 85 months, 29 days | $6,124.19 |
| LD64129 | 11/16/2004 | 12/16/2004 | $4,750 | 85 months, 28 days | $6,121.85 |
| LD64192 | 11/18/2004 | 12/18/2004 | $5,000 | 85 months, 26 days | $6,439.12 |
| LD64288 | 11/19/2004 | 12/19/2004 | $3,900 | 85 months, 25 days | $5,020.59 |
| LD64292 | 11/20/2004 | 12/20/2004 | $4,700 | 85 months, 24 days | $6,048.13 |
| LD64333 | 11/22/2004 | 12/22/2004 | $2,550 | 85 months, 22 days | $3,278.92 |
| LD64372 | 11/22/2004 | 12/22/2004 | $4,700 | 85 months, 22 days | $6,043.50 |
| LD64379 | 11/22/2004 | 12/22/2004 | $4,700 | 85 months, 22 days | $6,043.50 |
| **TOTAL** | | | **$228,913** | | **$297,463.53** |